IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ANGELA SMITH o/b/o      PLAINTIFF
D. J. T.

    v.      CIVIL NO. 06-3053

MICHAEL J. ASTRUE,[1] Commissioner
Social Security Administration      DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Angela Smith, brings this action on behalf of her minor child, D. J. T., seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner), denying D. J. T.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

## I. Background:

Plaintiff filed an application for SSI on D. J. T.'s behalf on October 24, 2003, alleging that D. J. T. became disabled on October 12, 2000, due to attention deficit hyperactivity disorder ("ADHD"). (Tr. 53). An administrative hearing was held on October 13, 2005. (Tr. 239-257). Plaintiff was present and represented by council. At the time, D. J. T. was 10 years old and in the fourth grade. (Tr. 23, 49).

The Administrative Law Judge ("ALJ"), in a written decision dated April 13, 2006, found that D. J. T.'s reading and mathematics learning disorders and ADHD were a severe impairment. He concluded that D. J. T. has marked limitations with regard to acquiring and using information;

---

[1] Michael J. Astrue became the Social Security Commissioner on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

less than marked limitations in the area of attending and completing tasks; less than marked limitations in interacting and relating with others; no limitations in his ability to move about and manipulate objects; no limitations with regard to his ability to care for himself; and, no limitations in the area of health and physical well-being. (Tr. 18-22). As such, the ALJ determined that D. J. T.'s impairment did not meet, medically equal, or functionally equal any listed impairment. (Tr. 18).

On July 6, 2006, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the matter is now ready for decision. (Doc. # 8, 9).

## II.  Evidence Presented:

On February 13, 2002, D. J. T. was reprimanded for pinching another child and failing to remain seated while the school bus was in motion. (Tr. 107). As a result, he was suspended from the bus for the remainder of the month. (Tr. 107).

On November 12, 2002, Dr. Byron Dickinson, Psy. D., evaluated D. J. T. (Tr. 154-164). I. Q. testing suggested his overall intellectual ability to be in the average range with low average verbal abilities; average performance abilities; and, borderline general fund of knowledge, attention, concentration, verbal memory, numerical reasoning, puzzle solving, synthesis, and/or general constructive skills. Common sense and social judgment skills were scored in the severe deficient range with low average scores in verbal abstracting, higher order thinking, expressive vocabulary, and visual abstracting skills. D. J. T.'s short-term visual memory and perceptual processing speed were superior and his ability to find missing parts, visual attention to details, and long-term visual memory skills were in the high average range. Dr. Dickinson noted that achievement tests suggested

borderline abilities in reading, writing, and mathematics. Difficulty was also noted with regard to addition and subtraction with attentive mistakes that appeared to have somewhat lower his arithmetic score. Dr. Dickinson recommended that the educational programming for D. J. T. be objectively designed to enhance his reading, written communication, and math skills. (Tr. 156). He also suggested that the school should consider further evaluation of his language skills with a more sophisticated instrument, utilize the "concentration game" to strengthen his basic reading and written expression skills, work on teaching him to write his letters correctly, utilize games or activities which involve matching or sorting items by common characteristics, utilize tangible objects to help him learn math facts, utilize activities which require eye hand coordination skills, utilize interventions typically used for children with ADHD, use "flash card" techniques, and give D. J. T. ample opportunity to master a concept before presenting new material. (Tr. 156-157).

On December 10, 2002, speech/language testing revealed adequate expressive and receptive language skills, conversational speech, vocal quality and fluency, and oral structures. (Tr. 166-167). No speech therapy was recommended. (Tr. 166-167).

In December 2002, school records revealed that D. J. T. had spent two years in kindergarten and continued to have delayed achievement in listening comprehension, reading, spelling, and arithmetic. (Tr. 108-109). He was also reportedly achieving two grade levels below the chronological age of his peers and required small group instruction. (Tr. 109). As a result, D. J. T. was enrolled in special education classes for reading, spelling/language arts, and math. (Tr. 69-81, 111).

On January 20, 2003, D. J. T. was treated for a stomach virus. (Tr. 199). At this time, Dr. Yoland Condrey indicated that D. J. T. was on Metadate CD once daily for ADHD, which he had

responded to, but not as well as the doctor had hoped. Therefore, Dr. Condrey increased his dosage to twice per day. (Tr. 199).

On March 20, 2003, Dr. Condrey indicated that D. J. T. was doing well on Metadate. (Tyr. 198). However, he had fallen out of bed the previous day and hit his head on a table, just above his right ear. D. J. T. complained of a fair amount of pain in that right temporal area during the night but did not lose consciousness. Dr. Condrey noted a good response to Metadate and a closed head injury without evidence of loss of consciousness. The doctor prescribed Motrin and warm compresses and continued D. J. T's dosage of Metadate. (Tr. 198).

In April 2003, D. J. T.'s standardized test results revealed below average word reading skills; reading skills with regard to two-sentence stories, functional reading comprehension, and interpretation; measurements; number facts; computation/symbolic notation; language usage; spelling sight words and phonetic principles; physical science; history; civics and government; and, functional listening. (Tr. 170).

On September 8, 2003, progress notes indicate that D. J. T. was very cooperative . (Tr. 196). Dr. Condrey diagnosed him with ADHD and indicated that he had a good response to Metadate. As such, this medication was continued at the same dosage. (Tr. 196).

On November 25, 2003, D. J. T.'s second grade teacher noted that his problems concentrating on class work, working independently and staying on task, and completing assignments on time noticeably interfered with his academics and/or social progress. (Tr. 64-67). She also reported physical over activity and problems learning from mistakes. (Tr. 65). The teacher stated that D. J. T. failed tests because academics were "too hard." She also indicated that his behavior had worsened over the previous 2 to 3 months. (Tr. 64-67).

On January 22, 2004, D. J. T. appeared to be doing fairly well in school but was not sleeping well at night. (Tr. 194). Dr. Condrey stated that he seemed "overly sensitive." The doctor diagnosed him with ADD with decreasing responsiveness to medication, emotional liability, and poor sleep. Dr. Condrey then prescribed a trial of Adderall XR. (Tr. 194).

On February 4, 2006, D. J. T. was reportedly very oppositional and had decreased attention with increased behavioral problems. Dr. Condrey switched D. J. T. to Strattera. (Tr. 194).

On February 19, 2004, D. J. T. continued to exhibit behavioral problems. (Tr. 194). Upon his mother's request, Dr. Condrey placed him back on Metadate CD. (Tr. 194).

This same date, D. J. T. was disciplined for rough housing with another child on the school bus. (Tr. 121). When confronted about this, he told the bus driver that he was absent on the date it allegedly happened, but this turned out to not be the case. D. J. T. was suspended from the bus for two days. (Tr. 121).

On March 29, 2004, D. J. T.'s teacher completed a second questionnaire. (Tr. 90-93). Noting that she was rating him while on medication, she indicated that the medication allowed him to make good choices. Ms. Paden also stated that D. J. T. exhibited good behavior, but only while on medication. She indicated that his medication was changed in February 2004 and that his behavior was terrible until he was taken off of the new medication and placed back on his original prescription. Ms. Paden stated that she had seen D. J. T. both on and off of his medication and that he was not able to function in a school setting without his medication. (Tr. 93).

On April 12, 2004, D. J. T. underwent an intellectual assessment and evaluation of adaptive functioning. (Tr. 200-204). Dr. Adam Brazas noted that D. J. T. appeared interested in the test items and was motivated to succeed. He stayed on task without distractibility and took time to reflect

5

before responding to a question or a performance task. I. Q. test results were in the low average range of intellect with a full scale I. Q. of 84. (Tr. 201). Comparison of test scores revealed that D. J. T. was achieving academically on a level consistent with his I. Q. (Tr. 202). As such, Dr. Brazas found no limitations with regard to concentration, persistence, or pace. (Tr. 204).

Standardized testing dated April 2004, revealed that D. J. T. was below the national grade percentile in all areas except for listening, mathematical problem solving, and environment. (Tr. 124).

A grade report for the first three grading periods of the 2003-2004 school year revealed an A, several Bs, and 1 C. (Tr. 97).

On October 19, 2005, the plaintiff told Dr. Condrey that D. J. T's medication was working well during the school day but seemed to wear off at about 4:00 pm, making it difficult for him to do his homework. (Tr. 214). She also indicated that D. J. T. became very irritable, defiant, and was sometimes destructive. D. J. T. was also having trouble falling asleep, although he was sleeping well once asleep. Dr. Condrey noted that D. J. T.'s affect was "a bit sad" and that he had a little left/right discrimination difficulty. The doctor prescribed a trial of Concerta. (Tr. 214).

On October 24, 2005, D. J. T. underwent a neuropsychological evaluation with Dr. Vann Smith, Ph. D. (Tr. 219-224). Dr. Smith noted a pattern of abnormal findings consistent with the presence of mild, bilateral, diffuse organic brain dysfunction of apparent long standing and static to slowly progressive velocity. His performance on a series of tests was said to be compatible with an impairment of those neurocognitive functions subserved by the frontal, prefrontal, and frontotemporal cerebral architecture of the brain with the left side affected more so than the right. Dr. Smith concluded that D. J. T.'s pattern of abnormal responses was similar to those associated

with the residuals of traumatic brain insult; cerebrovascular, hypoxic, toxic, or metabolic encephalopathy; or, the central, neurochemical dysregulation believed to be precipitated by the brain's adaptive response to chronically painful disease process. He diagnosed D. J. T. with mild, diffuse cognitive dysfunction secondary to head trauma suffered at around age 24-36 months. Dr. Smith also recommended a baseline evaluation by a pediatric psychiatrist, neurocognitive rehabilitation on an outpatient basis, and repeated neuropsychodiagnostic testing in six months to establish a baseline from which to accurately assess the efficacy of treatment and velocity/severity of his remaining neurocognitive deficits. (Tr. 224).

Dr. Smith also completed a mental RFC assessment. (Tr. 225-229). He determined that D. J. T. was unable to meet competitive standards with regard to maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work. He also concluded that D. J. T. was seriously limited but not precluded from traveling in unfamiliar places and using public transportation. It was also noted that D. J. T. was limited but satisfactory with regard to interacting appropriately with the general public, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness. (Tr. 228).

On January 16, 2006, D. J. T. was referred to Dr. Stephen Harris, Ph. D., for an intellectual assessment, mental status, and evaluation of his adaptive functioning. (Tr. 230-237). I.Q. testing

7

revealed a full scale I.Q. of 94, which falls within the average range of intellect. He showed slow learner/average ability in perception reasoning and an average ability in processing speed. Dr. Harris noted a significant difference between his verbal comprehension index and processing speed index in that his processing speed was much higher than his verbal comprehension. His processing speed was also significantly higher than his perceptual reasoning and working memory. Further testing revealed below average ratings in both reading recognition and arithmetic and slow learning/average ratings in spelling. The results were indicative of some difficulties with academic achievement. As such, Dr. Harris diagnosed D. J. T. with a reading learning disorder, a mathematics learning disorder, and ADHD. (Tr. 233). He assessed him with a global assessment of functioning score of 67 and considered his prognosis to be fair.

Dr. Harris also completed a childhood disability assessment. (Tr. 238). He concluded that D. J. T. had marked limitations in the area of acquiring and using information with less than marked limitations in all other areas. (Tr. 238).

### III. Discussion:

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than

a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s)

limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3). The ALJ determined that the facts in this case suggest D. J. T. had "less than marked"[2] limitations in the area of health and physical well-being, with no limitations in the remaining five domains. (Tr. 12-13).

First, the ALJ found that D. J. T. has marked limitations with regard to acquiring and using information. (Tr. 18). The ALJ pointed out D. J. T.'s average I.Q. with learning difficulties in reading, and mathematics. He also that D. J. T. was in resource classes at school. However, school records did reveal that D. J. T.'s grades were satisfactory. Ms. Paden, his second grade teacher, also indicated that D. J. T. wanted to do well academically and could do so when he was on his medication. Accordingly, we find substantial evidence supports the ALJ determination regarding this domain of functioning.

With regard to attending and completing tasks, the ALJ found D. J. T. has less than marked limitations. (Tr. 19). The record reveals that D. J. T. is on medication to treat his ADHD. Ms. Paden has indicated that D. J. T. is able to complete a normal school day without interruptions when he is on his medication. Medical records also reveal that since adjusting D. J. T.'s medication, he is able to concentrate and complete assignments. Although Dr. Harris noted some distractibility and concentration difficulties during his evaluation, he rated D. J. T.'s impairment in this area as less than marked. Likewise, Dr. Brazas found no limitations with regard to D. J. T.'s concentration,

---

[2] We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F. R. § 416.926a(e).

11

persistence, or pace; noted no fidgetiness, tiredness, or distractibility in the one-to-one testing situation; and, indicated that D.J. T. Did not even need a break between testing sessions. As such, we find that the evidence supports the ALJ's finding of less than marked limitations.

The ALJ also found D. J. T. has less than marked limitations with regard to interacting and relating with others. (Tr. 20). The record does reveal that D. J. T. has had some behavioral problems in the past that seemed to have occurred when he was either not taking his medication or else not taking the correct dosage medication. Plaintiff even told Dr. Brazas that D. J. T. had problems getting along with others when he did not take his medication. In March 2004, D. J. T.'s teacher reported no behavioral or social problems, noting that D. J. T. was taking his medication. In addition, D. J. T. told Dr. Brazas that he got along with his family and testified that he had friends at school and got along with others. Therefore, we find substantial evidence supporting the ALJ's determination that he has less than marked limitations in this area of functioning.

With regard to moving about and manipulating objects, the ALJ found D. J. T. has no limitations. (Tr. 17). There is no evidence to suggest difficulties in this area of functioning. Therefore, based on this lack of evidence, we conclude that the ALJ properly determined that D. J. T. has no limitations with regard to his ability to move about and manipulate objects.

In addition, the ALJ found that D. J. T. has no limitations in his ability to care for himself. (Tr. 22). Records reveal that D. J. T. took care of his own personal needs such as bathing and dressing himself daily, and he needed no special supervision, aside from assistance with the administration of his medication. Although Dr. Harris did note that D. J. T. had some interest in playing with fire, he also concluded that D. J. T. had less than marked limitations in this area of functioning. Dr. Brazas also noted the lack of need for special supervision in this area. As plaintiff

has not presented any evidence regarding limitations in this area, we agree with the ALJ's finding.

Finally, with regard to health and physical well-being, the ALJ found D. J. T. had no limitations. (Tr. 22). Here again, plaintiff has failed to present any evidence to indicate any impairments in this area of functioning. Therefore, substantial evidence supports the ALJ's finding that D. J. T. has no limitations in the area of heath and physical well-being.

### III. Conclusion:

Based on the forgoing, we find there is substantial evidence to support the ALJ's determinations with respect to the six domains. Accordingly, we conclude there is substantial evidence supporting the ALJ's determination that D. J. T.'s impairments do not medically or functionally equal any listed impairment.

DATED this 17th day of October 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)